

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

In re )
)
BRIAN BRUCE FRANKEL, ) Case No. 04-18190 SBB
SS# XXX-XX-3859 ) Chapter 7
Debtor, )
)
)
BARBARA A. PECKHAM, ) Adversary No.
)
Plaintiff, )
)
)
vs )
)
BRIAN BRUCE FRANKEL )
)
Defendant. )

## COMPLAINT OBJECTING TO THE DISCHARGEABILITY OF A DEBT PURSUANT TO 11 U.S.C.§523

COMES NOW, the Plaintiff, Barbara A. Peckham, by and through her attorney, John C. Eastlack, and for Complaint against the Defendant, Brian Bruce Frankel, states and alleges as follows:

### GENERAL ALLEGATIONS

1. This adversary proceeding is an action arising under the Debtor's bankruptcy proceeding case No. 04-18190 SBB. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. Section 1334 and 28 U.S.C. Section 157(a). This is a core proceeding under 28 U.S.C. Section 157(b)(2)(I).

2. The Defendant, Brian Bruce Frankel, filed a voluntary petition in bankruptcy under Chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Colorado on April 20, 2004, under case No. 04-18190 SBB.

3. The Plaintiff, Barbara A. Peckham, is a creditor of the Defendant. The Plaintiff is a resident of El Paso County, State of Colorado.

4. The Defendant, Brian Bruce Frankel, his wife Dori Smith-Frankel and the Plaintiff, Barbara A. Peckham, formed a corporation known as SFG Consulting, Inc. as a Colorado corporation on November 28, 2001. SFG Consulting, Inc. commenced business as an agency that would place mortgage loans with various mortgage lenders. The Debtor, his wife and the Plaintiff were all shareholders, members

of the Board of Directors and Officers of the corporation. Each party owed a fiduciary duty to each shareholder, director, officer and the corporation.

5. The Defendant and Dori Smith-Frankel held various meetings of the Board of Directors and in minutes authorized the opening of various bank accounts for SFG Consulting, Inc. excluding Barbara A. Peckham as a signatory on the corporate bank accounts. The Defendant and Dori Smith-Frankel took over control and operation of the business of SFG Consulting, Inc. in March of 2002. The Defendant and Dori Smith-Frankel received and paid or applied funds of SFG Consulting, Inc. to their own personal use and benefit.

6. Brian Bruce Frankel and Dori Smith-Frankel requested that Barbara A. Peckham provide her property at 8 Rock Hill Road, Manitou Springs, Colorado which was free and clear of any liens or encumbrances as collateral to obtain a loan from a private investor. This loan was to be used for the business of SFG Consulting, Inc. On September 11, 2002, Barbara A. Peckham, Dori Smith-Frankel and Brian Frankel executed an agreement to fund a loan to SFG Consulting, Inc. by pledge of Barbara Peckham's property. A copy of the Agreement is attached hereto and incorporated herein by reference as Exhibit "A".

7. The Defendant arranged a loan with Gary Glenn d/b/a Gold West Properties in the amount of $93,600. A copy of the Note is attached hereto and incorporated herein by reference as Exhibit "B". The Note was signed by SFG Consulting, Inc., Brian B. Frankel and Dori Smith-Frankel. A deed of trust was executed on November 6, 2002 by SFG Consulting, Inc., Brian B. Frankel, Dori Smith-Frankel and Barbara Peckham which pledged the property of the Plaintiff at 8 Rock Hill Road, Manitou Springs, Colorado as collateral securing the Note. A copy of the Deed of Trust is attached hereto and incorporated herein by reference as Exhibit "C".

8. Brian Frankel, Defendant, received all of the loan proceeds from the Note (Exhibit "B"). The Defendant failed to pay the parties who were to be paid in accordance with the Agreement of September 11, 2002 (Exhibit "A"). Brian Frankel, Defendant, applied and converted the loan funds received from the Note (Exhibit "B") to his individual and personal use fraudulently and in breach of his fiduciary duty to Barbara A. Peckham.

9. The Defendant by false representations and false pretenses persuaded Barbara A. Peckham to sign a long term Lease Agreement as a guarantor for SFG Consulting, Inc. for the business premises at 31 S. Tejon Street, Suite 500, Colorado Springs, CO 80903. The Defendanto nor his wife signed the lease guaranty, only Barbara A. Peckham. The landlord, Case Holdings Company, LLC, seeks damages

for the default under such Lease by SFG Consulting, Inc. in an amount of $80,521.52 plus attorney fees, interest and costs. The Plaintiff has incurred attorney fees and costs in defense of the landlord's suit in the District Court of El Paso County, Colorado, case No.03 CV 3341.

10.    The Defendant fraudulently and by defalcation failed to pay rent due to Case Holdings Company, LLC by the Agreement dated September 11, 2002 (Exhibit "A") at paragraph No. 4 of said Agreement.

### FIRST CLAIM FOR RELIEF PURSUANT TO
### 11 U.S.C.§523(a)(2)(A)

11.    Plaintiff restates the allegations as set forth in paragraphs No. 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10 of the Complaint as if set forth verbatim herein.

12.    Brian Bruce Frankel, Defendant, as alleged herein, received money and the pledge of the Plaintiff's property as a debt owed to the Plaintiff by false pretenses, false representation and actual fraud resulting in damages and loss to the Plaintiff.

13.    The actions of the Defendant have resulted in damages and loss to the Plaintiff as follows:

| Amounts | Description of Loss |
|---|---|
| $  1,567.72 | Settlement charges for refinance of Plaintiff's real estate. |
| $ 58,129.27 | Payoff of Gold West Properties deed of trust against Plaintiff's real estate. |
| $ 12,817.70 | AT&T Credit Card. |
| $ 20,728.93 | MBNA Credit Card. |
| $ 80,521.52 | Rent to Case Holdings Company by lease guaranty. |
| $  3,345.00 | Case Holdings Company charges for lease guaranty. |
| $177,110.14 | Total |

14.    The debt owed by the Defendant to the Plaintiff as herein set forth is nondischargeable pursuant to 11 U.S.C.§523(a)(2)(A).

### SECOND CLAIM FOR RELIEF PURSUANT TO
### 11 U.S.C.§523(a)(4)

15.    Plaintiff restates the allegations as set forth in paragraphs No. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14 of the Complaint as if set forth verbatim herein.

16.    Brian Bruce Frankel, Defendant, committed fraud and defalcation while acting in a fiduciary capacity as an officer, director and shareholder of SFG Consulting, Inc. by receipt of loan

funds from the Plaintiff's real estate property and by failure to pay and apply such loan funds as required under the September 11, 2002 Agreement (Exhibit "A") and by conversion and embezzlement of subject funds for the Defendant's own personal use and benefit.

17. The debt owed by the Defendant to the Plaintiff is nondischargeable pursuant to 11 U.S.C.§523(a)(4).

<u>THIRD CLAIM FOR RELIEF PURSUANT</u>
<u>TO 11 U.S.C.§523(a)(6)</u>

18. Plaintiff restates the allegations as set forth in paragraphs No. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17 of the Complaint as if set forth verbatim herein.

19. The actions and omissions of Brian Bruce Frankel, Defendant, as set forth herein represent willful and malicious injury by the Defendant to the Plaintiff and the property of the Plaintiff. The actions of the Defendant are in violation of 11 U.S.C.§523(a)(6).

20. The debt owed by the defendant to the Plaintiff is nondischargeable pursuant to 11 U.S.C.§523(a)(6).

WHEREFORE, the Plaintiff, Barbara A. Peckham, prays that the debt owed to the Plaintiff in such amounts to be determined at the time of trial be nondischargeable in this proceeding pursuant to 11 U.S.C.§523(a)(2)(A), and/or §523(a)(4), and/or §523(a)(6); that judgment enter for the Plaintiff, Barbara A. Peckham, and against the Defendant, Brian Bruce Frankel, including interest at the legal rate, attorney fees and costs of this proceeding and for such other and further relief as to the Court seems just and proper.

DATED: *July 20, 2004*

JOHN C. EASTLACK, P.C.

BY: *John C. Eastlack*
John C. Eastlack #489
2125 N. Academy
Colorado Springs, Co. 80909-1591
(719) 597-8085
Attorney for Barbara A. Peckham,
Plaintiff

Address of Plaintiff:
10 Rock Hill Road
Manitou Springs, CO 80829

STATE OF COLORADO )
                  ) ss.
COUNTY OF EL PASO )

I, Barbara A. Peckham, Plaintiff, having been first duly sworn upon oath, do hereby state that I have read the foregoing Complaint and that the contents thereof are true and correct to my best knowledge and belief.

Subscribed and sworn to before me this 20th day of July, 2004, by Barbara A. Peckham.

Notary Public
2125 N. Academy Blvd
Colorado Springs, CO   80909

My commission expires:

December 9, 2007

CERTIFICATE OF MAILING

I certify that I have mailed a true and correct copy of the foregoing Complaint, by U.S. Mail, postage prepaid, this 20th day of July, 2004, to the following:

U S Trustee                              Eric A. Nunemaker, Esq.
999 18th St. #1551                       1437 High St.
Denver, CO   80202                       Denver, CO 80218

Tom H. Connolly, Esq.                    Brian B. Frankel
390 Interlocken Cresenct #490            8225 Cottongrass Ct.
Broomfield, CO   80021                   Castle Rock, CO   80108



## AGREEMENT

THIS AGREEMENT is made the __11__ day of September, 2002, by and between Barbara Peckham, Dori Smith-Frankel and Brian Frankel as Founders, Officers, Directors, Shareholders of S.F.G. Consulting, Inc. ("SFG") and individually.

NOW THEREFORE, in consideration of the premises, the consideration set forth herein and other consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Barbara Peckham hereby grants SFG and Brian & Don Frankel the right to use 8 Rock Hill Rd., Manitou Springs, CO 80829, free and clear property with Barbara Peckham in title, as collateral in obtaining a $90,000 loan from a private investor, for the exclusive use of SFG. The net proceeds (net proceeds shall mean gross proceeds less reimbursement to Barbara Peckham for legal fee to David A. Cook, P.C. fee of $588.00, Jim Tucker appraisal fee of $400.00 and any other normal closing costs) shall immediately be deposited in the US Bank account of SFG and checks shall be issued, within 7 days, to pay the following expenses and/or reimbursals:

1.) MBNA (line of credit card)----$19,713.32 (exact on day of closing)

2.) AT&T (line of credit card)----$12,698.13 (exact on day of closing)

3.) Barbara Peckham (Reimbursement for loans as Yomama, Ltd. to various business entities, including SFG Consulting, Inc.; payment of unpaid commissions & salary from SFG; and reimbursement for other SFG obligations, receipts and accounting to be provided----$14,856.52 (Balance due) (see attached Exhibit A)

4.) Case-Holdings (lease arrears through September 10, 2002)----$13,449.65

5.) SFG Phone----$5,422.36

6.) Attorney Ed Diaz (ASAP removal of credit derogatories from Barbara Peckham credit report)----$1,500.00 (exact as of day of closing)

7.) Reimburse Barbara Peckham for any additional payment relating to this loan to Attorney David A. Cook, P.C.)----$ 648.00

8.) Reimburse lender for $5,000.00 advance against this loan.

9.) Reimburse Dori Smith-Frankel for personal deposits made to SFG account for recent September payments to vendors $4,607.69 (see attached Exhibit B)

Balance of loan proceeds on deposit to be paid in installments to vendors as agreed upon between SFG and vendors and current expenses not to include compensation to any party to this agreement, except by the written agreement of all parties.

The terms of this Agreement, the collateral offered, and all agreements for repayment of this debt shall in no way affect the existing stock distribution or create any stock redistribution, unless agreed upon unanimously by all parties.

A Deed of Trust will be executed by Barbara Peckham, SFG's Secretary-Treasurer. A Promissory Note will be executed by SFG's President, Brian Frankel and



Exhibit "A"     1

Dori Smith-Frankel, SFG's Vice-President. The Promissory Note will be in the name of SFG with Brian and Dori Smith Frankel as personal guarantors. The Note and Deed of Trust must provide Barbara Peckham with notice of default and the right to cure.

It is further agreed that the Promissory Note will be paid by SFG and or the guarantors at a minimum rate of $5,000 per month for a maximum of 18 months, at which time, principal and interest must be totally defrayed and the Deed of Trust must be released from the 8 Rock Hill Rd. property. Any balance remaining must be paid wholly or in part as agreed upon between the Frankels and the private investor, using their own collateral. In the event of corporate default at any time for any reason in repayment of this Promissory Note, payment becomes the personal responsibility of Brian & Don Frankel and they so agree.

Corporate consent to this Agreement is hereby approved by the Shareholders, Officers and Board of Directors of SFG.

Beginning 7 days following the funding and depositing of the loan, and on the 1st day of each month thereafter SFG will pay Barbara Peckham $575.00 for use of the 8 Rock Hill Rd. property as storage space and collateral, until such time as the $90,000.00 loan has been paid in full and the lien removed from said property.

SFG further agrees to continue to pay $161.12 per month for Key Woman/Buy-Sell Stock agreement Insurance (10-year term policy for $100,000.00) on the life of Barbara Peckham; insurance premiums on Brian Frankel ($450,000.00) and Don Frankel ($250,000) according to provisions of key person and stock buy-sell agreement already in force at SFG; as well as payment of parking fees, corporate travel, and wireless phone fees for these three original investors. Brian Frankel, Dori Smith-Frankel and Barbara Peckham, as original contributors of goods, services and collateral, and all three persons as long as they continue to contribute financially to SFG, as loan originators or managers shall be granted rent-free office space, with remaining office and cubicle space to be bartered, rented or bonused rent-free by General Manager Brian Frankel as deemed in the best interests of the corporation.

It is also agreed that copies of the 18-month Corporate Financial Plan, current Budget and current Profit & Loss Statement, prepared by Brian Frankel, will be due by October 15, 2002, for review at the next scheduled Board of Directors meeting.

Finally, it is agreed that any future changes in the structure of SFG shall assume all the assets and debts of SFG, as well its prior legal agreements.

All corporate and real estate documents, including the Deed of Trust and Promissory Note, must be approved by attorney David A. Cook, P.C. prior to the closing.

At a Board of Directors meeting to be held not later than November 1, 2002, the parties hereto agree to expand the Board of Directors, in accordance with the Corporate By-Laws or changes in these By-Laws unanimously approved by the existing Board of Directors. Each member of the Board of Directors shall receive a copy of all Contractual relationships in SFG including employee salaries and bonuses, Manager overrides & bonuses, Loan Officer commissions and bonuses, as well as Loan Partner and Loan Officer Assistant's sources of remuneration and bonuses, for clarification of company structure at this meeting.

2

On or before October 15, 2002, Brian Frankel & Barbara Peckham shall agree on her status as a Loan Originator, Loan Partner, Part-time Assistant, and/or Loan Officer, with what commission percentage, bonus structure, salary base, job responsibilities, etc. This separate agreement shall be in writing.

Each of the parties to this Agreement warrants that no promise, consideration, or inducement has been offered except as herein set forth, that all parties executing this Agreement are legally competent, and that all parties accept full responsibility thereof.

This Agreement embodies the entire understanding between the parties. This Agreement may not be altered, superseded, or otherwise modified except in a writing signed by the parties. The terms of this Agreement are contractual and not mere recitals, and no representations have been made to any of the undersigned that is not contained herein.

This Agreement may be executed in counterparts. All executed copies of this Agreement are duplicate originals.

If any provision of this Agreement shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby.

This Agreement all be construed and enforced in accordance with the laws of the State of Colorado.

In the event any dispute arises with regard to the interpretation or enforcement of this Agreement, or any action is brought to enforce or construe the terms of this Agreement, the successful party shall be entitled to an award of all costs and expenses incurred, including attorney fees, whether or not a suit is actually commenced. This Agreement shall be construed under the laws of the state of Colorado.

The terms set forth herein shall be binding upon the parties to this Agreement and their successors, assigns, heirs, executors, administrators and legal representatives and shall not be affected by, and shall survive, the death or incapacity of any of the undersigned.

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

Barbara Peckham     10-12-02

Barbara Peckham          Date

Dori Smith-Frankel     10-12-02

Dori Smith-Frankel          Date

         10-11-02

Brian Frankel          Date

Loan Number: 20021010SFG

# BALLOON NOTE
### (Fixed Rate)

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

November 6, 2002                    Colorado Springs, COLORADO

8 Rock Hill Road
Manitou Springs, COLORADO 80829
(Property Address)

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $93,600.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is

**Gary Glynn DBA Goldwest Properties a Colorado Company.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 16.750%.

The interest rate required by Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on **January 1, 2003**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on June 1, 2004, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

**Gary Glynn DBA Goldwest Properties**
**560 Ford Street**
**Colorado Springs, COLORADO 80915**

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payments will be in the amount of U.S. $1,306.50.

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sum already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of SIXTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

Exhibit "B"

*Loan Number: 20021010SFG*

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the rights to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

SFG Consulting, Inc.                                    _____ (Seal)
Social Security Number: 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                              -Borrower

Brian B. Frankel                                       _____ (Seal)
Social Security Number: 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                             -Borrower

_____ (Seal)
Dori Smith-Frankel                   -Borrower
Social Security Number: 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    Social Security Number:      _____ (Seal)
                                                                -Borrower

*(Sign Original Only)*

WHEN RECORDED, MAIL TO:
Gary Glynn DBA Goldwest Properties
560 Ford Street
Colorado Springs, COLORADO 80915

Prepared by:
Gary Glynn DBA Goldwest Properties
560 Ford Street
Colorado Springs, COLORADO 80915

Loan Number: 2002101USFG
Order Number:

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **November 6, 2002** together with all Riders to this document.

(B) **"Borrower"** is SFG Consulting, Inc. and Brian B. Frankel and Dori Smith-Frankel
Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is Gary Glynn DBA Goldwest Properties. Lender is a **Colorado Company**,
organized and existing under the laws of Colorado.
Lender's address is 560 Ford Street, Colorado Springs, COLORADO 80915.
Lender is the beneficiary under this Security Instrument.

(D) **"Trustee"** is the Public Trustee of EL PASO County, Colorado

(E) **"Note"** means the promissory note signed by Borrower and dated **November 6, 2002.** The Note states that Borrower owes Lender NINETY-THREE THOUSAND SIX HUNDRED and no/100 Dollars (U.S. $93,600.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **June 1, 2004**

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

☒ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☒ Balloon Rider ☐ Planned Unit Development Rider ☐ VA Rider
☐ 1-4 Family Rider ☐ Biweekly Payment Rider
☐ Other (Specify):

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation

COLORADO Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                      Page 1 of 8                                    Form 3006 1/01
IDS, Inc - (800) 554-1872
                                                                Borrower(s) Initials

*Exhibit "C"*

or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of EL PASO:

Lots 1 and 3, BLK #4, Barnett-Lennon Addition

Parcel Identification Number:

which currently has the address of: 8 Rock Hill Road
Manitou Springs, COLORADO 80829                                    ("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
IGS, Inc. - (800) 554-1872                      Page 2 of 9                          Form 3006 1/01
                                         Borrower(s) Initials

shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.** **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**COLORADO**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

Page 8 of 0

**Form 3006** 1/01

Borrower(s) Initials

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction, (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.

Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

K59 Inc - (800) 554-5972                     Page 7 of 9                              Form 3000 1/01

Borrower(s) Initials

or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

DDS Inc - (800) 554-1812                                      Page 8 of 9                                      Form 3006 1/01

Borrower(s) Initials _____

postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

33. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

34. Waiver of Homestead. Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____

_____ (Seal)
                                     —Borrower
                                   SFG Consulting, Inc.

                                   _____ (Seal)
                                                                       —Borrower
                                   Brian B. Frankel

_____ (Seal)
Barbara Peckham                    —Grantor

                                   _____ (Seal)
                                                                       —Borrower
                                   Dori Smith-Frankel

STATE OF COLORADO,
                                    County ss:
The foregoing instrument was acknowledged before me this _____ day of _____
by SFG Consulting, Inc., and Brian B. Frankel, and Dori Smith-Frankel and  Barbara  Peckham

Witness my hand and official seal.

My commission expires.

                                   _____
                                   Notary Public

FILED
BRADFORD L. BOLTON
CLERK

04 JUL 20 PM 3:37

## Local Bankruptcy Form 102.2, Cover Sheet

U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| **Adversary Proceeding Cover Sheet**<br>(Instructions on Reverse) | **Adversary Proceeding Number**<br>(Court Use Only) |



| | |
|---|---|
| Plaintiffs<br>BARBARA A. PECKHAM | Defendants<br>BRIAN BRUCE FRANKEL |
| Attorneys (Firm Name, Address, & Telephone)<br>John C. Eastlack<br>2125 N. Academy Blvd.<br>Colorado Springs, CO 80909-1591<br>No. Attorney: [ ]#489       (719)597-8085 | Attorneys (if known)<br>Eric A. Nunemaker<br>1437 High St.<br>Denver, CO 80218<br>No. Attorney: [ ] |

04-1725 MER

Party (check one box only): [ ] 1. U.S. Plaintiff; [ ] 2. U.S. Defendant; [x] 3. U.S. Not a P...

Cause of Action (write a brief statement of cause of action, including all U.S. statutes involved):
Complaint objecting to dischargeability of debt.

Nature of Suit (check only the one most appropriate box)

```
[ ] 424 Object to or revoke a discharge 11 U.S.C. ' 727
[XX] 426 Determine the dischargeability of a debt 11 U.S.C. ' 523
[ ] 434 Obtain an injunction or other equitable relief
[ ] 435 Determine Validity, Priority, or Extent of a Lien or Other Interest in Property
[ ] 454 Recover Money or Property
[ ] 455 Revoke an order of confirmation of a Chap. 11 or Chap. 13 Plan
[ ] 456 Obtain a declaratory judgment relating to any of the foregoing causes of action
[ ] 457 Subordinate any allowed claim or interest except where such subordination is provided in a plan
[ ] 458 Obtain approval for the sale of both the interest of the estate and of a co-owner in property
[ ] 459 Determine a claim or cause of action removed to a bankruptcy court
[ ] 498 Other (Specify)
```

| Origin of Proceedings (check one box only):  1. [x] Original; 2. [ ] Removed; 4. [ ] Reinstated or Reopened; 5. [ ]<br>Transferred from Another Bankruptcy Court | | [ ] Check if this is a class action<br>under F.R.Civ.P. 23 |
|---|---|---|
| Demand<br>$ | Nearest Thousand |  Other Relief Sought | [ ] Jury Demand |

Bankruptcy Case In Which This Adversary Proceeding Arises

| Name of Debtor(s)<br>Brian Bruce Frankel | | Bankruptcy Case No.<br>04-18190 SBB |
|---|---|---|
| District in which Case is Pending<br>Colorado | Divisional Office<br>Denver | Name of Judge<br>Brooks |

Related Adversary Proceeding (if any)

| Plaintiff | Defendant | Adversary Proceeding No. |
|---|---|---|
| | | |
| District in which Case is Pending | Divisional Office | Name of Judge |

Filing Fee (check one box only): [ ] Fee attached; [ ] Fee not required; [ ] Fee is deferred

| Date<br>7/20/04 | Name (print)<br>John C. Eastlack | Signature of Attorney (or Plaintiff) |
|---|---|---|

# Local Bankruptcy Form 102.2, Continued
## Adversary Proceeding Cover Sheet (Reverse Side)

This cover sheet must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney) and submitted to the Clerk of the Court upon the filing of a complaint initiating an adversary proceeding.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. This form is required for use by the Clerk of the Court to initiate the docket sheet and to prepare necessary indices and statistical records. A separate cover sheet must be submitted to the Clerk of the Court for each complaint filed. The form is largely self explanatory.

Parties: Enter the names of the parties to the adversary proceeding exactly as they appear on the complaint. Give the names and addresses of the attorneys, if known. Following the heading "Party," check the appropriate box indicating whether the United States is a party named in the complaint. If the plaintiff is pro se, that is, not represented by an attorney, check the box labeled "no attorney."

Cause of Action: Enter a brief description of the cause of action including all federal statutes involved, for example: "Complaint seeking damages for failure to disclose information, Consumer Credit Protection Act, 15 U.S.C. ' 1601 et seq.," or "Complaint by trustee to avoid a transfer of property by the debtor, 11 U.S.C. ' 544."

Nature of Suit: Place an "X" in the appropriate box. Only one box should be checked. If the cause fits more than one category or suit, select the most definitive.

Origin of Proceedings: Check the appropriate box to indicate the origin of the case:

　　　　　　　　　1. Original Proceeding
　　　　　　　　　2. Removed from a State or District Court
　　　　　　　　　4. Reinstated or Reopened.
　　　　　　　　　5. Transferred from Another Bankruptcy Court

Demand: Enter the dollar amount demanded in the complaint in thousands of dollars. If the amount is less than $1,000 enter "0001", for $1,000-9,999 enter "1", for $10,000-99,999 enter "10", for $100,000-999,999 enter "100", for $1,000,000-9,999,999 enter "1000," for more than $10,000,000 enter "9999", for no monetary demand, enter "XXXX". If the plaintiff is seeking non-monetary relief, state the relief sought, such as injunction or foreclosure of a mortgage.

Bankruptcy Case In Which This Adversary Proceeding Arises: Enter the name of the debtor and the docket number of the bankruptcy case from which the proceeding now being filed arose. Beneath, enter the district and divisional office where the case was filed, and the name of the presiding judge.

Related Adversary Proceedings: Enter the names of the parties and the six digit adversary proceeding number from any adversary proceeding concerning the same two parties or the same property currently pending in any bankruptcy court. On the next line, enter the district where the related case is pending and the name of the presiding judge.

Filing Fee (check one box): The fee must be paid upon filing unless the plaintiff meets one of the following exceptions: (1) If the plaintiff is the United States government or the debtor, then the fee is not required; (2) If the plaintiff is the trustee or a debtor in possession, and there are no liquid funds in the estate, then the filing fee may be deferred until there are funds in the estate. In the event no funds are ever recovered for the estate, there will be no fee. There is no fee for adding a party after the adversary proceeding has commenced.

Signature: This cover sheet must be signed by the attorney of record in the box on the right of the last line of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

The name of the signatory must be printed in the box to the left of the signature. The date of the signing must be indicated in the box on the far left of the last line.